THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

MARIA MINA FABBROCINI, M.D.,
Individually, and on behalf of all other similarly
situated individuals,

        Plaintiff,               Case No. 19-cv-198

v.

ROBERT PEARCE, M.D., individually, and
BOARD OF REGENTS OF THE UNIVERSITY OF
WISCONSIN SYSTEM

        Defendants.

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION, HER APPOINTMENT AS CLASS
REPRESENTATIVE, AND FOR PINES BACH LLP TO BE CLASS COUNSEL**

## I.    Introduction

Named Plaintiff, Maria Mina Fabbrocini, ("Fabbrocini") brought this lawsuit

pursuant to 42 U.S.C. § 1983 and Federal Rule of Civil Procedure 23(a) against

Dr. Robert Pearce ("Pearce") for using his powers as Chair of the Department of

Anesthesiology of the University of Wisconsin School of Medicine & Public Health

("the Department") under the color of state law, in violation of the Fourteenth

Amendment of the U.S. Constitution, to deliberately participate in sex discrimination

within the Department that adversely affected and damaged the members of the

proposed class, all of whom are female. As a remedy for Pearce's unconstitutional

conduct, Fabbrocini seeks all available damages including but not limited to

1

compensatory and punitive damages as well as the expenses of this action, including reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

Fabbrocini seeks this relief for herself and for all others similarly situated for the sex discrimination that they suffered as a result of Pearce's actions. To that end, she has moved the Court pursuant to Rule 23(a) of the Federal Rules of Civil Procedure to certify a class of plaintiffs consisting of:

> All female physicians designated as full-term employees, who were employed in the Department of Anesthesiology of the University of Wisconsin School of Medicine & Public Health at any time between March 13, 2013 until the appointment of Dr. Aimee Becker as interim Chair to succeed Dr. Robert Pearce on August 16, 2017.

Rule 23(a) states**:**

> (a) PREREQUISITES. One or more members of a class may sue or be sued as representative parties on behalf of all members only if
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

This memorandum will explain why this case meets all four of Rule 23(a)'s prerequisites, as well as the requirements of Federal Rule of Civil Procedure 23(b)(3). It will also explain why the Court should enter an order appointing Fabbrocini as class representative, and name Pines Bach LLP as counsel for the class.

**II.** **The proposed class meets Rule 23(a)'s prerequisites.**

**A. The Proposed Class satisfies the "Numerosity" prerequisite.**

A class may be certified only if it is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). It is not necessary for a plaintiff to "specify an exact number of potential class members to prove numerosity," *Reliable Money Order, Inc. v. McKnight Sales Co.*, 281 F.R.D. 327, 332 (E.D. Wis. 2012) (citing *Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir.1989)), *aff'd*, 704 F.3d 489 (7th Cir. 2013). "Although there is no definite standard as to what size class satisfies Rule 23(a)(1), ... [c]lasses containing [between two and 26] members have been held to be too small to allow an action to be maintained under Rule 23." *Wright & Miller*, 7A Federal Practice and Procedure § 1762 (3d ed.). "Generally, joinder is considered impracticable for classes numbering at least 40 persons." *Reliable Money Order, Inc.*, 281 F.R.D. at 332 (citing *Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n. 9 (7th Cir.1969)).

As courts and commentators have consistently recognized, a small number of class members by itself does not mean that joining all potential litigants is "practicable." *See* NEWBERG ON CLASS ACTIONS §3.6 at 250 (4th ed. 2002). As a result, courts often consider the ease or difficulty of identifying class members for joinder in determining whether a class satisfies the numerosity requirement. *Id; see Ramirez v. GLK Foods, LLC*, No. 12-C-210, 2014 WL 2612065, at *4 (E.D. Wis. June 11, 2014).

Here, joinder would be neither practicable nor reasonable for the members of the proposed class. At minimum, 49 female physicians were employed in the Department during the period of this action that Pearce was Chair, and at least 40 of them fit within

3

the terms of the class definition proposed by Fabbrocini. (Patterson Dec. ¶6, Exhs. D and E.) Thus, consistent with the holding in *Reliable Money Order, Inc.*, *supra*, the size of the proposed class is sufficient to justify class treatment, because it is beyond the threshold in which joinder is considered practicable.

Furthermore, there are important practical reasons not to order joinder of all 40 female anesthesiologists as individual plaintiffs in this case. In 2017, in response to complaints of pervasive sex discrimination within the Department, the University of Wisconsin-Madison ("the University"), through Casey Nagy, an attorney and former administrator for the University, conducted an investigation and prepared a detailed, fact-based report entitled a *Climate Review of Department of Anesthesiology* ("the Nagy Report"). (Patterson Dec. ¶¶3, 5, Exhs. A, C at 1.)

The Nagy Report found that the Department was characterized by "a caustic environment in which apprehension and fear are generally present" and where "bullying behaviors are commonplace." (Patterson Dec. ¶5 Exh. C at 17.) "[T]here also is **general apprehension about retaliation** against those who resist, or speak against such conduct, because it is seen as a form of unacceptable defiance." (Patterson Dec. ¶5 Exh. C at 17) (emphasis added.) The concerns Nagy discovered about bullying and retaliation in the Department are a barrier that would strongly discourage individual plaintiffs from pursuing litigation were the Court to order joinder in this matter.

Additionally, a six-year statute of limitations applies to claims arising from the constitutional violations caused by Pearce arising from the pervasive sex discrimination in the Department. Ordering joinder would limit the potential recovery of the class

4

members because over ten months have passed since this lawsuit was filed. If the members of the proposed class were required to join this case as individual plaintiffs, they would not benefit from the fact that Fabbrocini filed this lawsuit on March 13, 2019, which allows for damages suffered by the class from March 13, 2013 through the date Pearce was replaced, August 16, 2017. The claims would be, at a maximum, limited to a date in 2014 (or later), depending on when joinder might be ordered and when they could file a summons and complaint.

Finally, as discussed in Section II.B., *infra*, the class not only shares a common legal issue but shares a large body of common facts, which are reflected in the Nagy Report. Therefore, a joinder of class members would be inefficient given how strongly common issues predominate in this case.

## B. The Proposed Class satisfies the "Commonality" prerequisite.

Class certification requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality requires "a common contention .... of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). "What matters... [is] the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id*.

Here, class-wide resolution of the claims will answer the common issues presented in this litigation. They are: (i) whether Pearce was responsible for and deliberately participated in an environment of sex discrimination in the Department of

5

Anesthesiology during his time as Chair; and (ii) whether Pearce's acts that supported the Department's environment of sex discrimination were taken under color of state law. Because Pearce has already admitted in answer to Fabbrocini's amended complaint that his actions as the Chair of the Department were all taken under color of state law, that issue is resolved. (Dkt. 17, Answer to Amended Complaint, ¶ 1)

Thus, the common question that applies to all members of the proposed class is whether Pearce was responsible for and deliberately participated in an environment of sex discrimination in the Department during his tenure as its Chair. A common adjudication of that issue will provide relief to all class members.

Fabbrocini has alleged that Pearce was responsible for an environment of sex discrimination within the Department in violation of the Fourteenth Amendment of the U.S. Constitution, because his acts as Chair deliberately created or contributed to a hostile work environment against women anesthesiologists, a lack of equal opportunities for women anesthesiologists, and unequal pay for women anesthesiologists. (Dkt. 13, Amended Complaint ¶¶ 64-69.) Her claim is actionable under 42 U.S.C. § 1983 pursuant to the equal protection clause of the Fourteenth Amendment. *See Bohen v. City of East Chicago, Ind.*, 799 F.2d 1180, 1185–87 (7th Cir. 1986) (hostile environment claims are an area of employment discrimination that the Fourteenth Amendment forbids and are therefore actionable under 42 U.S.C. § 1983); *Riordan v. Kempiners*, 831 F.2d 690, 695 (7th Cir. 1987) ("women complaining of pay discrimination can. . . sue under 42 U.S.C. § 1983 for violation of the equal protection clause").

All members of the proposed class worked within a harmful climate of sex discrimination. This is demonstrated by the multitude of facts common to the class that were uncovered during the investigation that lead to the Nagy Report, which made a comprehensive evaluation of the Department supported by detailed factual findings[1] produced from over 130 interviews (including nearly every anesthesiologist) and extensive documentary information. (Patterson Dec. ¶5 Exh. C at 1.) Subsequently, initial class discovery has uncovered additional facts common to the class that demonstrate the Department's harmful climate of sex discrimination. This extensive record of common facts "demonstrate[s] that the class members 'have suffered the same injur[ies],'" therefore the Court should find that the common constitutional question of the class satisfies the commonality prerequisite. *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 497 (7th Cir. 2012).

1. **There was a hostile work environment based on gender within the Department where all of members of the proposed class worked.**

After reviewing the climate of the Department, Nagy found "gender is an issue in the Department" (Patterson Dec. ¶5 Exh. C at 14), and that there existed "an undercurrent of male centrism that actively influences workplace conditions throughout the Department." (Patterson Dec. ¶5 Exh. C at 7.) Concerning the impact on female anesthesiologists in the Department, Nagy found "**the cumulative impacts are**

---

[1] "Each finding is supported by direct evidence (personal testimonials or documentary information), and additionally has been corroborated by multiple additional sources. No finding represents the narrative or perception of only one or two individuals, and care has been taken to ensure that corroboration comes from men and women both, across all categories of employment statute (e.g., faculty of all tracks and ranks, CRNAS, AAs and administrative staff)." (Patterson Dec. ¶5 Exh. C at 1)

**undeniable.** For many, the experience is like an endless succession of cloudy days –
sometimes it rains, but more often it's just gray, and sometimes chilly, and not as fun."
(Patterson Dec. ¶4 Exh. B at 8) (emphasis added.)

The Nagy Report found that among the "descriptors" commonly used by
interviewees to describe the Department's culture were the terms "disrespect,
discriminatory, and toxic" as well as "inequality, misogynistic, sexist, and patriarchal."
(Patterson Dec. ¶5 Exh. C at 7.) Furthermore, Nagy found that descriptions of the
Department as gender-biased did not come from female faculty only; "[s]ome male
faculty offered additional perspective, describing the departmental culture as a *boy's
club*, or a *frat-boy environment*, or a *good-old boy* network." (Patterson Dec. ¶5 Exh. C at 7.)

Nagy found that all women physicians in the Department were subject to the
Department's undercurrent of male centrism as well as hostile behaviors evidenced by
many senior male physicians and administrators. (Patterson Dec. ¶4 Exh. B at 8;
Patterson Dec. ¶5 Exh. C at 7, 14.) He, also, found that women in faculty roles
predominately held by women physicians were subject to abusive professional
criticisms that were a pretext for gendered harassment. (Patterson Dec. ¶5 Exh. C at 11,
13.) A majority of part-time anesthesiologists and a majority of pediatric
anesthesiologists in the Department were women, and the Nagy Report found that
antagonism toward these roles was a pretext for gender dismissiveness or hostility.
(Patterson Dec. ¶5 Exh. C at 10-11, 13.)

At the time of his review, Nagy found that part-time anesthesiologists were at a
ratio of 3 women to 1 man. (Patterson Dec. ¶5 Exh. C at 10.) Nagy found that part-time

women anesthesiologists were habitually the target of "numerous comments from male colleagues (and senior leaders) suggesting their female colleagues lack a full measure of commitment to medicine because of family priorities, that they 'cost' the department more, and that their interest in maintaining a 'work-life balance' is selfish in view of departmental needs and patient care." (Patterson Dec. ¶5 Exh. C at 10.) In contrast, Nagy stated that "part-time male faculty did not report being subjected to critical comments regarding their status." (Patterson Dec. ¶5 Exh. C at 10.) Nagy found that the "gendered character" of these criticisms "in combination with other departmental attitudes and practices" enforced the Department's male centric environment and "risk[ed] further relegating women to a secondary status." (Patterson Dec. ¶5 Exh. C at 10.)

Similarly, Nagy found that female pediatric anesthesiologists were subjected to a relentless barrage of insults with "an open patina of gender dismissiveness or irritation." (Patterson Dec. ¶5 Exh. C at 13.) "Numerous interviewees - - men and women - - commented on the commonality of references to pediatrics as 'the crying hospital,' or 'candyland,' or pediatrics faculty as 'candy-stripers.'" (Patterson Dec. ¶5 Exh. C at 13.) He concluded that these insults were targeted attacks against female pediatric anesthesiologists, stating, "there are simply too many other ways in which gender appears to have been inserted into the work space to overlook the implications here, or to fail to appreciate the measure of disrespect communicated through terms of reference that infantilize professional clinical judgments." (Patterson Dec. ¶5 Exh. C at 14.)

The Nagy Report found that, due to the departmental climate of offensive, gendered criticism, women anesthesiologists routinely reported "day-to-day exchanges" of "having been made to feel 'less,' or subjected to comments, attitudes and behaviors dissimilar in kind from anything their male colleagues might experience." (Patterson Dec. ¶5 Exh. C at 11.) Nagy held that many of the Department's male anesthesiologists "[ha]ve gone way too far," because they "persistently denigrate" their female colleagues and "evidence attitudes of hostility or limited acceptance of belonging," (Patterson Dec. ¶4 Exh. B at 11); their hostile attitudes "are no longer excusable." (Patterson Dec. ¶5 Exh. C at 11.)

Additionally, the Nagy Report discovered "repeated instances of men differentially positioning female faculty… simply by the manner of their introduction and/or treatment, and the effect is unquestionably cumulative." (Patterson Dec. ¶5 Exh. C at 16.) Female anesthesiologists reported often being introduced as "young lady" rather than as a physician. (Patterson Dec. ¶5 Exh. C at 16.) Other devaluing or discriminatory statements that Nagy reported as being recurrently stated by male anesthesiologists toward their female colleagues include: "Don't tell me you're knocked up too;" "'If he dies, I'm sure he'd rather yours be the last face he sees.' And references to stretch marks, and bloating, and other references to pregnancy that again demean the individual's status as a peer and a professional." (Patterson Dec. ¶5 Exh. C at 16.)

Nagy also found, through interviews, numerous "instances in which the research and service achievements of men were publicized far more expansively than was the experience of women." (Patterson Dec. ¶5 Exh. C at 16.) As Chair, Pearce was the

10

decision-maker responsible for publicizing the accomplishments of faculty in the Department. (Fabbrocini Dec. ¶8.) He would often recognize faculty achievements through email or during faculty meetings. (Fabbrocini Dec. ¶8.) Commonly, Pearce would disregard the accomplishments of female anesthesiologists entirely, while, in contrast, praising male anesthesiologists publicly even for performing basic procedures. (Fabbrocini Dec. ¶9.)

Nagy found that the Department's "male centric environment" with "a tolerated disrespect toward women" was layered on top of a departmental culture where "bullying behaviors are commonplace" in which "status, voice, language, and body language all are used in ways to intimidate others." (Patterson Dec. ¶5 Exh. C at 17.) This bullying behavior "certainly occurs" in "expression[s] of male-female interactions." (Patterson Dec. ¶5 Exh. C at 17.). And this culture of bullying created "general apprehension about retaliation against those who resist, or speak against such conduct, because it is seen as a form of unacceptable defiance. This affects not only those who are directly victimized by uncollegial behavior, but discourages observers from intervening, broadening the sweep of overall discomfort." (Patterson Dec. ¶5 Exh. C at 17.)

In the face of these undeniable cumulative impacts, senior female faculty often advised women residents and young women colleagues[2] to "'keep their head down'

---

[2] "Not only would these behaviors directly condition the behaviors/experiences of female residents, but they undoubtedly would influeunce the 'peer' relationships of young female residents brought into the Department as physicians." (Patterson Dec. ¶5 Exh. C at 9.)

and simply tolerate practices they might find directed to them because they were women because that was just [sic] [how] things worked," (Patterson Dec. ¶5 Exh. C at 14), "and "'don't rock the boat and you'll be okay' - - in effect being told just to endure behaviors directed at them because of their gender because it was the best way to 'get by.'" (Patterson Dec. ¶5 Exh. C at 9.)

During his time as Chair, Pearce participated in bullying behaviors and deliberately did not address instances of bullying and physical intimidation by male physicians against female faculty and staff. (Fabbrocini Dec. ¶10-11.) His decision to disregard the complaints of female faculty and staff against certain senior male faculty culminated in several egregious incidents, including one senior male faculty physically assaulting various female members of the Department, including Fabbrocini, and another senior male faculty serially sexually assaulting his anesthetized female patients. (Fabbrocini Dec. ¶12.)

When assigning responsibility for the toxicity and gender-bias in the Department, Nagy held, "[a]s Chair of the Department for the last 10 years (only recently announcing his resignation), Dr. Pearce ultimately is the person primarily accountable for conditions in the Department." (Patterson Dec. ¶5 Exh. C at 3.) In response to Casey Nagy's findings, the Dean of the School of Medicine and Public Health ("Dean") met with Pearce and requested his compulsory resignation. (Patterson Dec. ¶13, Exh. K, at 1-2.) The Dean and Casey Nagy were so concerned with Pearce's conduct as Chair that they sought to appoint "one or two 'executive vice chairs'" to "keep an eye on things and report back to [the Dean] and the Provost" while he

12

remained in leadership during the search for a new Chair to replace him. (Patterson Dec. ¶13, Exh. K, at 2.) In response, Pearce rejected any oversight of his leadership so long as he remained head of the Department, and an interim Chair was instead appointed to oversee the Department during the search for a new Chair. (Patterson Dec. ¶13, Exh. K, at 1; Patterson Dec. ¶4, Exh. B at 1.)

As a direct consequence of the hostile-work environment created by Pearce's leadership, the members of the class suffered compensatory damages, such as emotional distress caused by pervasive harassment, intimidation, fear of retaliation, fear of potential violence from male co-workers, etc. (Dkt. 13 ¶¶59, 68) (Fabbrocini Dec. ¶13.)

### 2. Pearce caused and countenanced unequal opportunity in the Department for female physicians.

Nagy further found that due to Pearce's leadership appointments, there existed a "tolerated disrespect, a lack of open eligibility for advancement and persistent underrepresentation of women." (Patterson Dec. ¶5 Exh. C at 7.) Junior female anesthesiologists also were determined to have less access to mentoring by senior faculty than male counterparts. (Patterson Dec. ¶5 Exh. C at 7-8) (Fabbrocini Dec. ¶7.) Most disturbingly, there were "several instances of individuals - - men - - being left in significant leadership positions despite well-documented practices hostile to women." (Patterson Dec. ¶4, Exh. B at 8.) (Fabbrocini Dec. ¶11.)

As the Chair of the Department, Pearce was solely responsible for appointing individuals to leadership positions within the Department. (Patterson Dec. ¶5 Exh. C

at 6.) Due to Pearce's leadership appointments, although "[a]mong the faculty, men outnumber[ed] women by an approximate 2:1 ratio. . . the representation of women in more prominent leadership positions seem[ed] to have been well below this ratio." (Patterson Dec. ¶5 Exh. C at 6.) Moreover, for eight of his ten years as Chair, Pearce did not appoint any women "to roles that include[d] them in the Chair's weekly leadership meeting." (Patterson Dec. ¶5 Exh. C at 6.) Furthermore, Pearce instituted a policy,[3] which disqualified a majority of female anesthesiologists from leadership positions. (Patterson Dec. ¶5 Exh. C at 6) (Fabbrocini Dec. ¶6.) As Pearce had full control over leadership appointments in the Department, he was solely responsible for denying female anesthesiologists' access to leadership positions and was solely responsible for forming and preserving a male dominated leadership team that included several members with "well-documented practices hostile to women." (Patterson Dec. ¶4 Exh. B at 8.)

Consequently, the members of the Class suffered compensatory damages, such as financial loss, due to Pearce's creation and countenance of unequal opportunities. (Dkt. 13 ¶¶59, 68) (Fabbrocini Dec. ¶13.)

**3. Pearce discriminated on the basis of sex in making discretionary pay decisions.**

---

[3] "Early in his tenure as Chair, Dr. Pearce reportedly instituted a policy against considering part-time faculty for leadership role." (Patterson Dec. ¶5 Exh. C at 6.) "[M]ost of the part-time faculty are women, and this practice effectively has reduced for years the eligibility of women generally to be considered for leadership roles (only very recently, a few part-time faculty were appointed to leadership roles)." (Patterson Dec. ¶5 Exh. C at 6.)

Nagy found that faculty had "lingering concerns about gender equity" in the Department's compensation plan. (Patterson Dec. ¶5 Exh. C at 20.) Documents produced by the Defendant, during initial class discovery, indicate that Pearce was gender-biased in his awarding of Chair discretionary year end awards. (Patterson Dec. ¶¶7-12 Exhs. F, G, H, I.) From 2013 to 2017, the size of the awards he provided to male physicians were substantially greater than those he gave female physicians. (Patterson Dec. ¶12.) In 2013, female physicians in the Department, who received discretionary bonuses from Pearce, received on average $9,150.00 and male physicians received on average $14,285.71. (Patterson Dec. ¶7 Exh. F.) In 2014, female physicians in the Department, who received discretionary bonuses from Pearce, received on average $9,227.27 and males received on average $13,636.36. (Patterson Dec. ¶8 Exh. G.) In 2015, female physicians in the Department, who received discretionary bonuses from Pearce, received on average $7,291.17 and males received on average $15,613.64. (Patterson Dec. ¶9 Exh. H.) In 2016, female physicians in the Department, who received discretionary bonuses from Pearce, received on average $12,583.33 and males received on average $14,625.00. (Patterson Dec. ¶10 Exh. I.) In 2017, female physicians in the Department, who received discretionary bonuses from Pearce, received on average $9,615.38 and males received on average $19,895.58. (Patterson Dec. ¶11 Exh. J.)

In total, from 2013-2017, Pearce granted $30,189.14 more per capita male bonus recipient than per capita female bonus recipient. (Patterson Dec. ¶12.) In other terms, in total from 2013-2017, Pearce allocated a total of $26,308.71 of bonus funds more per capita male physician than female physician. (Patterson Dec. ¶12.)

Furthermore, Pearce's actions during the University's 2015 review of the Department's compensation plan indicate that his gender bias in compensation decisions was deliberate. In 2015, the University conducted a review of the Department's compensation plan due to concerns raised by female faculty about gender pay inequities in the Department. (Dkt. 13 ¶¶36-37; Dkt. 17 ¶¶36-37). Pearce was the sole individual responsible for providing compensation data to the University for the review. (Dkt. 13 ¶38) (Fabbrocini Dec. ¶10.) Pearce interfered with the accuracy of the University's compensation review by providing the University an altered data set; Pearce only provided the compensation data of three quarters (59 out of 78) of the physicians working in the Department in 2015. (Patterson Dec. ¶9 Exh. H; Patterson Dec. ¶17, Exh. S) (Fabbrocini Dec. ¶10.) Rather than provide the complete dataset that was requested, Pearce excluded the compensation data of numerous physicians, including Fabbrocini as well as many other women, from the information he provided the University. (Fabbrocini Dec. ¶10.)

Consequently, the members of the Class suffered compensatory damages, such as but not limited to wage loss, due to Pearce's pay discrimination. (Dkt. 13 ¶¶59, 68) (Fabbrocini Dec. ¶13.)

### 4. The Class's common question is apt to generate common answers that will resolve an issue that is central to the validity of the Class's claims.

As stated previously the common question of the Class is whether Pearce was responsible for and deliberately participated in an environment of sex discrimination in the Department of Anesthesiology during his time as Chair. In answer to this common

question, the class holds a common contention: *As Chair Pearce was responsible for the Department's overall climate by deliberately participating in acts of sex discrimination that created or contributed to the Department's environment of sex discrimination, and these discriminatory acts caused common compensatory damages to the class members, such as emotional distress caused by the hostile-work environment, loss of opportunities, loss of wages, etc.* The determination of this contention's "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores*, 131 S. Ct. 2551. The truth or falsity of the class's common contention will determine whether Pearce is liable to the members of the class under 42 U.S.C. § 1983 for violating the Fourteenth Amendment of the U.S. Constitution. And the resolution of each class members' claim against Pearce is dependent on the Court's determination on this common contention.

Additionally, there are extensive facts common to the class cited throughout this Memorandum, which demonstrate that the class's common question has the "capacity to" and, in fact, will "generate common answers apt to drive the resolution of the litigation." *Id.* The class's common question is likely to generate the following common answers:

1) Pearce, during his time as Chair, was responsible for and deliberately participated in an environment of sex discrimination in the Department;

2) all class members existed in and were damaged by the Department's environment of sex discrimination; and

3) all class members are entitled to compensatory and punitive damages to remedy the emotional distress caused by the hostile-work environment, the loss of opportunities, the loss of wages, and any other economic misfortune

caused by Pearce's discriminatory acts. (The size of individual damage awards may vary among class members.)

The common facts and these prospective common answers demonstrate that the class's common contention is material and "that the class members 'have suffered the same injur[ies],'" therefore the Court should hold that the commonality element is satisfied. *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 497 (7th Cir. 2012).

**C. The proposed class satisfies the "Typicality" prerequisite.**

For many of the same reasons that the commonality prerequisite is satisfied, the typicality prerequisite is also met. A plaintiff class may be certified only if "the claims of the representative parties are typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). The named plaintiffs' claims must "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . [are] based on the same legal theory." *De La Fuente v. Stokely-Van Camp*, 713 F.2d 225, 232 (7th Cir. 1983).

In this case, Fabbrocini's claims fall squarely within those of the larger plaintiff class that she represents. Her claims, which are described in paragraphs 24 through 65 of her amended complaint (Dkt. 13) and the claims of all members in the class, arise from the same environment of sex discrimination, which included a hostile work environment, unequal pay, and unequal opportunity in the Department. Additionally, all claims are based on the same legal theory--namely, that Pearce was responsible for and deliberately participated in the Department's environment of sex discrimination and acted under color of state law to do so, in violation of the equal protection

guarantees of the Fourteenth Amendment of the U.S. Constitution. (Dkt. 13 ¶¶ 64-69; Fabbrocini Dec. ¶¶ 1-14.) This is the most appropriate claim, if not the only appropriate claim, to obtain relief for the discrimination suffered by members of the class, and the Court should find the typicality element is satisfied.

## III.    Fabbrocini's proposed class satisfies the prerequisites of Federal Rule of Civil Procedure 23(b)(3)

Having established the prerequisites of Federal Rule of Civil Procedure 23(a), the Court must determine the appropriate type of class under Federal Rule of Civil Procedure 23(b). The Court should find this case meets the requirements of Rule 23(b)(3), which allows an action to be maintained as a class if "the questions of law and fact common to the members of the class predominate over any questions affecting only individual members," and should be certified if "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FRCP 23(b)(3).

### 1.    Common issues predominate because legal and factual questions here will be resolved with proof common to Plaintiff and class members.

Under Fed. R. Civ. P. 23(b)(3), "[p]redominance of issues common to all class members, like the other requirements for certification of a suit as a class action, goes to the efficiency of a class action as an alternative to individual suits." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014). "An issue 'central to the validity of each one of the claims' in a class action, if it can be resolved 'in one stroke,' can justify class treatment." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013). "Common issues of fact and law predominate if they 'have a direct impact on every class member's effort to

19

establish liability and on every class member's entitlement to injunctive and monetary

relief.'" *Klay*, 382 F.3d at 1255.

Here, the common issues predominate. As extensively illustrated in the

"commonality" section of this memorandum, roughly the same evidence will be used

by each class member to prove liability, and the issues at stake are "susceptible to

generalized, class-wide proof." *In re Nassau County Strip Search Cases*, 461 F.3d 219, 227

(2d Cir. 2006); *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 815 (7th Cir. 2012)

("common questions can predominate if a 'common nucleus of operative facts and

issues' underlies the claims brought by the proposed class"). This sufficiently

establishes predominance, as "Rule 23(b)(3). . . does not require a plaintiff seeking class

certification to prove that each 'elemen[t] of [her] claim [is] susceptible to class-wide

proof.'" *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 469, 133 S. Ct.

1184, 1196, 185 L. Ed. 2d 308 (2013) (insertions are from original quotation). Therefore,

the issues common to all class members predominate over any individual issues.

The fact that individualized determinations of damages may be required does

not undermine the predominance of the common issues.

> Rule 23(b)(3) [does not] require. . . common results for members of the class. That
> approach would come very close to requiring. . . [that] class members. . . [not
> only provide] for a showing of common questions, but for a showing of common
> answers to those questions. Rule 23(b)(3) does not impose such a heavy burden.

*Messner*, 669 F.3d at 819. "[C]ommon proof of damages for class members. . . is not

required." *Id*. "It is well established that, if a case requires determinations of individual

issues of causation and damages, a court may 'bifurcate the case into a liability phase

and a damages phase.'" *McMahon v. LVNV Funding, LLC* 807 F.3d 872, 876 (7th Cir. 2015).

Because damages determinations can be fact-intensive, the Court can first certify the class to determine liability. Once liability is determined, a major issue that predominates over every class members' claims will have been resolved. The Court then has numerous options for determining each class member's damages. For example, it could appoint a special master, conduct a series of mini-trials, or use mediation to determine damages for individual litigants. As the proposed Class likely consists of less than fifty employees, and not several million as in *Wal-Mart*, these options, if necessary, do not present a burden to the Court.

**2.   A class action is superior to the adjudication of dozens of separate individual cases.**

In addition, Plaintiff's class action under Federal Rule of Civil Procedure 23(b)(3) satisfies the "superiority" requirement. The superiority analysis of Rule 23(b) requires that the Court examine whether the class action is superior to other methods of adjudication. Fed. R. Civ. P. 23(b)(3). "Rule 23(b)(3)'s superiority requirement. . .is comparative: the court must assess efficiency with an eye toward 'other available methods.'. . . 'If judicial management of a class action ... will reap the rewards of efficiency and economy for the entire system that the drafters of the federal rule envisioned, then the individual judge should undertake the task." *Mullins v. Direct Digital, LLC* 795 F.3d 654, 664 (7th Cir. 2015). If a class action is the superior method, it is "the well-settled presumption that courts should not refuse to certify a class merely on

the basis of manageability concerns." *Id.* at 663. "District courts have considerable experience with and flexibility in engineering solutions to difficult problems of case management." *Id.* at 664 (citations omitted).

The number of plaintiffs is of sufficient size that it is "superior to other available methods" of adjudication in terms of efficient allocation of judicial resources. Fed. R. Civ. P. 23(b)(3). Aggregation in this circumstance is more efficient because it avoids duplication and enables faster processing of the dozens of claims, which rely upon a large body of common facts. *See* 2 William B. Rubenstein & Alba Conte, Newberg on Class Actions § 4:64 (5th ed. 2013).

Furthermore, as stated previously, there is a history of bullying within the Department and faculty has a "general apprehension about retaliation against those who resist, or speak against" misconduct in the Department. (Patterson Dec. ¶5 Exh. C at 17) (emphasis added). The sex discrimination issues in the Department have been subject to media attention in recent years, and this lawsuit similarly garnered media attention shortly after its filing. **(**Patterson Dec. ¶15, Exhs. M, N, O; Patterson Dec. ¶16, Exhs. P, Q, R.) In light of the publicity, it is very likely that many members of the proposed class would be unwilling to move forward with individual lawsuits out of a valid fear of peer retaliation and bullying within the Department. In other words, for the female anesthesiologists in the Department, there is "safety in numbers."

Moreover, the expense of litigating when set against the damage claims of some of the class members is such that some class members may be discouraged from pursuing their claims outside of a class action. And because the Defendant is sued in his

22

individual capacity, class litigation will reduce the burden he faces compared to defending against a multitude of separate lawsuits.

## IV.   Fabbrocini can and will adequately represent the interests of the Class.

A class may be certified only if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Courts look to whether the named plaintiffs have "a sufficient interest in the outcome to ensure vigorous advocacy," as well as any "antagonistic or conflicting claims with other members of the class." *Stawski v. Secured Funding Corp.*, No. 06-CV-0918, 2008 WL 647024, at *2 (E.D. Wis. Mar. 6, 2008) (internal quotation marks and citations omitted); *see Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

Fabbrocini's interests are coextensive with those of the proposed Class. As is true of every member of the class, Fabbrocini is a female physician, who was employed in the Department during the time period relevant to the lawsuit and is a long-term employee who served in the Department when it was chaired by Pearce. As is true of every member of the class, she was subjected to a sex discriminatory environment which had various injurious features, including a hostile work environment, unequal opportunities, and unequal pay. (Fabbrocini Dec. ¶¶ 5, 13.)  She seeks equitable compensation for herself and all class members to remedy the economic and emotional damages caused by Pearce, because of the harmful sex discriminatory environment he maintained in the Department. Fabbrocini, therefore, has a genuine concern with the outcome of this class action.

Fabbrocini has no conflicts with other members of the class. She was and is a co-employee and has asserted no claims other than those which are consistent with all other class members.

## V.     Pines Bach LLP can fairly and adequately represent the interests of the class.

Fed. R. Civ. P. 23(g)(1)(B) requires that class counsel must fairly and adequately represent the interests of the class. In appointing a class counsel, the Court must consider counsel's work in investigating potential claims; counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; counsel's knowledge of the applicable law; and the resources counsel will commit to representing the class. *See* Fed. R. Civ. P. 23(g)(1)(A).

Pines Bach LLP is an experienced Wisconsin law firm that handles a broad range of claims on behalf of plaintiffs, including in class actions, federal constitutional and civil rights claims, and other complex litigation. In recent years, Pines Bach has brought numerous high-profile state and federal constitutional and civil rights cases in both state and federal courts. *See One Wisconsin Now v. Kremer*, 354 F. Supp. 3d 940 (W.D. Wis. 2019); *League of Women Voters of Wisconsin v. Evers*, 2019 WI 75, 387 Wis. 2d 511, 929 N.W.2d 209; *Planned Parenthood of Wisconsin, Inc. v. Schimel*, 806 F.3d 908, 909 (7th Cir. 2015); *Madison Teachers, Inc. v. Walker*, 2014 WI 99, 358 Wis. 2d 1, 851 N.W.2d 337. The attorneys at Pines Bach have deep experience prosecuting, including class actions and discrimination and employment cases, have committed and will continue to commit more than sufficient resources to prosecuting this case, and are well qualified to handle this matter on behalf of the class. Pines Bach attorneys have previously served as class

and collective counsel, *see, e.g., Torres v. Seemeyer,* 207 F. Supp. 3d 905 (W.D. Wis. 2016);

*Neuser v. Carrier Corp.,* No. 06-C-645-S, 2007 WL 1470855, at *1 (W.D. Wis. May 15, 2007);

*Gundrum v. Cleveland Integrity Servs., Inc.,* No. 16-CV-369-WMC, 2017 WL 414491, at *1

(W.D. Wis. Jan. 31, 2017), *transferred* No. 17-CV-55-TCK-TLW, 2017 WL 3503328, at *1

(N.D. Okla. Aug. 16, 2017).

## VI.   CONCLUSION

For the reasons above, the Court should certify a plaintiff class as follows:

> All female physicians designated as full-term employees, who were employed in the Department of Anesthesiology of the University of Wisconsin School of Medicine & Public Health at any time between March 13, 2013 until the appointment of Dr. Aimee Becker as interim Chair to succeed Dr. Robert Pearce on August 16, 2017.

Furthermore, the Court should name Fabbrocini as the representative class plaintiff and

appoint Pines Bach LLP as class counsel.

Respectfully submitted this 15th day of January 2020.

PINES BACH LLP

*/s/ Beauregard William Patterson*            .
Lester A. Pines, SBN 1016543
Tamara B. Packard, SBN 1023111
Beauregard William Patterson, SBN 1102842

*Attorneys for Plaintiff Maria Mina Fabbrocini,*
*individually, and on behalf of all others similarly*
*situated*

25

<u>Mailing Address:</u>
122 West Washington Ave.
Suite 900
Madison, WI 53703
(608) 251-0101 (telephone)
(608) 251-2883 (facsimile)
lpines@pinesbach.com
tpackard@pinesbach.com
bpatterson@pinesbach.com