IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MARIA MINA FABBROCINI, M.D.,
individually and on behalf of other similarly
situated individuals,

|  |  |
|---|---|
| Plaintiff, | OPINION AND ORDER |
| v. | 19-cv-198-wmc |
| ROBERT PEARCE, M.D., individually, and BOARD OF REGENTS OF THE UNIVERSITY OF WISCONSIN SYSTEM, |  |
| Defendants. |  |

---

Plaintiff Maria Mina Fabbrocini, M.D., brought this lawsuit under 28 U.S.C. § 1983, claiming that Dr. Robert Pearce, the former Chair of the Department of Anesthesiology at the University of Wisconsin ("UW") School of Medicine and Public Health, violated her Fourteenth Amendment rights, as well as those of other female anesthesiologists employed with UW, by engaging in deliberate sex discrimination. Before the court is plaintiff's motion for class certification. (Dkt. #21.)[1] Because plaintiff has failed to demonstrate that the proposed class satisfies the numerosity requirement of Federal Rule of Civil Procedure 23(a), the court must deny that motion.

## BACKGROUND

Plaintiff seeks to certify the following class under Federal Rule of Civil Procedure 23:

> All female physicians designated as full-term employees, who
> were employed in the Department of Anesthesiology of the

---

[1] Plaintiff also asserts a claim under the Equal Pay Act, 29 U.S.C. § 206(d), against the Board of Regents of the UW System, but she does not seek to certify this claim as a class action.

> University of Wisconsin School of Medicine & Public Health
> at any time between March 13, 2013 until the appointment of
> Dr. Aimee Becker as interim Chair to succeed Dr. Robert
> Pearce on August 16, 2017.

(Pl.'s Opening Br. (dkt. #22) 2.)

In support of her motion for class certification, plaintiff primarily relies on a 2017 report by Casey Nagy, an attorney and former UW administrator, who was retained by the Anesthesiology Department to conduct an investigation into complaints of sex discrimination and issue a report.  (Patterson Decl., Ex. C (dkt. #24-6).)  Among other things, Nagy's resulting report, titled *Climate Review of Department of Anesthesiology*, describes "a caustic environment in which apprehension and fear are generally present" and "bullying behaviors are commonplace."  (*Id.* at 17.)  In particular, the report highlights "gender" as an area of "acute concern," emphasizing the following concerns:

- defendant Pearce's prior practice of not appointing any part-time anesthesiologists to leadership roles, which disproportionately impacted women (*id.* at 6);

- "several instances of individuals -- men -- being left in significant leadership positions for extended periods of time despite well-documented practices disrespectful of women and others" (*id.*);

- the "undercurrent of male centrism" in the department's culture, which various interviewees described using words like "inequality, misogynistic, sexist and patriarchal" (*id.* at 7);

- "extensive evidence of highly unprofessional behaviors, often -- but not exclusively -- involving interactions with female faculty and anesthetists" (*id.*

2

at 8);

- "[m]any women -- mostly junior faculty but not exclusively -- recounted numerous comments from male colleagues (and senior leaders) suggesting they lack a full measure of commitment to medicine because of family priorities" (*id.* at 10);

- a disproportionate representation of women in the residency program (*id.* at 14);

- tension and lack of accommodation with respect to pregnancy and nursing (*id.* at 15);

- practice of referring to female employees as "young lady," or similar comments, rather than referencing her status as a physician or anesthetist, which Nagy labeled "positioning" (*id.* at 16);

- less publicity around female employees' research or service achievements (*id.* at 16);

- commonplace bullying behaviors (*id.* at 17); and

- lack of transparency around compensation decisions disproportionately impacted women (*id.* at 17-18).

Even so, Nagy's report also noted that "many interviewees -- including a number of senior women faculty -- denied seeing or experiencing any disparate treatment on the basis of gender." (*Id.* at 10; *see also id.* at 14 ("Others -- including some women -- simply did not see [gender] as a concern, suggesting in part that it has been unfairly confused with issues involving part-time status.").) Nagy further emphasized that reports of bullying were "not

3

merely an expression of male-female interactions (although that certainly occurs). Numerous examples were shared by both men and women contributing by their behaviors to caustic environment in which apprehension and even fear are commonly experienced." (*Id.* at 17.)  Nagy similarly describes material differences, especially in light of the "rapid geographic and clinical diversification of the Department," resulting in a "disaggregated character," and specifically notes that "clinical and research faculty seem to operate in largely separate spheres." (*Id.* at 4-5.)  Nagy specifically emphasizes that the employees in the pediatric section -- where Fabbrocini works -- are particularly denigrated and treated with a lack of respect by other colleagues. (*Id.* at 13.)

Defendants challenge the admissibility of Nagy's report, contending that it is inadmissible hearsay and does not fall within any of the exceptions of that rule.  At the same time, defendants anticipate that plaintiff will argue that the report constitutes a public record and that factual findings from a legally authorized investigation are admissible under Federal Rule of Evidence 803(8)(A)(iii) and (B).  Still, defendants argue that this exception does not apply because:  "(1) the report does not contain 'factual findings from a legally authorized investigation'; and (2) the report lacks trustworthiness." (Defs.' Opp'n (dkt. #27) 30.)  In support of this argument, defendants latch onto a statement in the report that "[t]he purpose of this review is not investigatory," although Nagy goes onto clarify that the report is not investigatory in the sense that it is not "focused on any specific issue or purpose." (Patterson Decl., Ex. C (dkt. #24-6) 1.)

Whether some or all of the report will ultimately be admissible for the truth of the matters asserted need not be decided for purposes of ruling on plaintiff's pending motion

for class certification, since portions of the report are certainly admissible for other purposes, including general context. Moreover, while Nagy did not make formal, factual findings as to "possible violations of law, regulatory rules, or policy," he was required to make a report as to issues within the department and aspects of the workplace that required change after interviewing over 130 members of the Department and reviewing voluminous documentary information. (Pl.'s Reply (dkt. #34) 4 (citing Patterson Decl., Ex. C (dkt. #24-6) 14, 18, 19).) Moreover, while the report documents Nagy's personal observations based on this extensive research, this hardly renders the report untrustworthy, or at least defendants have failed to establish as much at this stage of the case. *See Daniel v. Cook Cnty.*, 833 F.3d 728, 740 (7th Cir. 2016) ("[A]n evaluative report is presumed to be admissible in a civil case. The burden to show untrustworthiness is on the party seeking to exclude an evaluative report."). Thus, the court has *considered* the report for purposes of evaluating plaintiff's motion for class certification, including ironically enough Nagy's observations about critical differences across the department and at least some female employees' disavowal of any gender-based issues.

In addition to attacking the admissibility of the Nagy report generally, defendants direct the court to potential distinctions between class members, and particularly between named plaintiff Fabbrocini and other putative class members. For example, defendants point to: distinctions between those primarily following a clinical as opposed to an academic track, and how that impacts compensation; the availability of reduced schedule work, and how that may also impact compensation and professional development opportunities; and differences in an employee's geographic location.

In reply to these criticisms, plaintiff appears to step back from her original, sweeping class definition, suggesting the class would only include those female physicians who experienced a hostile work environment created by Dr. Pearce within the UW's Anesthesiology Department between 2013 and 2017, with any monetary claim based on unequal pay or discriminatory promotions being relevant to damages, rather than a basis for liability.  (Pl.'s Reply Br. (dkt. #34), 13-17.)  Even accepting such a narrowing of the class to those with a hostile work environment claim would further strain plaintiff's ability to meet the numerosity requirement.[2]

## OPINION

To certify a class under Federal Rule of Civil Procedure 23(b)(3), Fabbrocini must satisfy a two-step analysis.  *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).  First, the proposed class must satisfy the four threshold requirements under Rule 23(a): numerosity, commonality, typicality and adequacy.  *Id.*  Second, the proposed class must satisfy the two requirements under Rule 23(b)(3):  predominance and superiority.  *Id.*

Current law further requires the trial court to engage in a "rigorous analysis" to determine whether the proposed class satisfies these Rule 23 requirements.  *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 722 (7th Cir. 2011).  As a result, the Rule 23 analysis may overlap with a determination of the merits of the case.  *Wal-Mart Stores,*

---

[2] This also begs the question as to whether the court could properly consider unequal pay and discrimination in promotions for damages purposes without considering these claims with respect to liability.

*Inc. v. Dukes*, 564 U.S. 338, 352 (2011), requiring that "the judge . . . make a preliminary inquiry into the merits," *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001). If factual disputes arise, the judge may even be required to receive evidence and resolve material disputes before ruling on class certification, keeping in mind that this "should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner,* 669 F. 3d at 811.

Plaintiff seeks to certify a class for purposes of pursuing her equal protection, sex-discrimination claim, and more specifically, as she clarified in her reply, to pursue her hostile work environment claim as a class. To prevail on a class-wide, hostile work environment claim, however, plaintiff's representative "must show that (1) [class members were] subject to unwelcome harassment; (2) the harassment was based on [their sex]; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018). While *Johnson* concerned sex discrimination claims under Title VII, a hostile work environment claim would require proof of the same elements, with the added requirement that the plaintiffs show defendant acted under color of law. *See Alamo v. Bliss*, 864 F.3d 541, 548 n.16 (7th Cir. 2017) ("When a plaintiff uses § 1983 as a parallel remedy to a Title VII hostile work environment claim, the elements needed to establish liability are the same under both statutes.").

With both the class action standard and the elements of a hostile work environment claim in mind, the court is compelled to conclude that plaintiff cannot satisfy the

numerosity requirement.  That requirement is satisfied when "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Of course, a class's size need not be determined with absolute certainty; instead, the requirement is satisfied "so long as it's reasonable to believe [that the class is] large enough to make joinder impracticable and thus justify a class action suit."  *Chapman v. Wagener Equities Inc.*, 747 F.3d 489, 492 (7th Cir. 2014) (citing *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677-78 (7th Cir. 2009)).  In particular, the Seventh Circuit has recognized that "a forty-member class is often regarded as sufficient to meet the numerosity requirement."  *Orr v. Shicker*, 953 F.3d 490, 498 (7th Cir. 2020) (quoting *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017)).

Latching onto this threshold of sorts, plaintiff maintains that there are 40 putative class members who could assert a hostile work environment claim, actually listing them by name in her reply brief in support of class certification.  (Pl.'s Reply (dkt. #34) 8-9 (citing Patterson Decl., Exs. D, E (dkt. ##24-4, 24-5)).)  Plaintiff further represents that based on Nagy's report, "a majority if not all of the women in the Class will consent to this action if certified."  (*Id.* at 9.)  Putting aside whether such an inference is reasonable from the Nagy report, the Seventh Circuit recently reviewed the numerosity requirement in *Anderson v. Weinert Enterprises, Inc.*, 986 F.3d 773 (7th Cir. 2021), affirming a district court's denial of class certification on that basis.  In particular, the court observed that "a class of 40 or more does not guarantee numerosity."  *Id.* at 777 (citing *Pruitt v. City of Chi.*, 472 F.3d 925, 926 (7th Cir. 2006)).  Instead, the Seventh Circuit's focus was on whether joinder is "impracticable."  *Id*. at 777.  Noting that this "does not mean 'impossible,'" the court

explained that "a class representative must show 'that it is extremely difficult or inconvenient to join all the members of the class.'" *Id.* (quoting 7A C. Wright & A. Miller, Fed. Practice & Proc. § 1762 (3d ed.)).

Here, plaintiff has completely failed to demonstrate that joinder is impracticable. Not only does the record show all of the prospective class members have been identified, but the vast majority are still employed at UW -- defendants represent 27 of the 38 on their list are so employed.  Moreover, even among those who are not currently employed by the UW, their new positions or locations are likely known or easily ascertainable.  For these reasons, plaintiff is left to contend that joinder is "impracticable" because "individuals will be forced to pay legal fees for separate representation."  (Pl.'s Reply (dkt. #34) 11.)  However, not only could this be addressed in a contingency fee agreement, but plaintiff also is pursuing an equal protection claim under § 1983, meaning that plaintiff and any other female UW anesthesiologists who wish to join the lawsuit could obtain attorneys' fees under 42 U.S.C. § 1988 if successful.  *See Paper Sys. Inc. v. Mitsubishi Corp.*, 193 F.R.D. 601, 605 (E.D. Wis. 2000) (noting that the availability of attorney's fees make joinder more feasible).

Plaintiff also argues that joinder is impracticable because of fear of retaliation and bullying.  However, plaintiff offers no explanation as to why the fear of retaliation and bullying would be materially different if an individual failed to opt out of such a small class rather than agreed to join as a plaintiff in this lawsuit.  *See De Leon v. Grade A Construction, Inc.*, Case No. 16-cv-348-jdp, 2017 WL 6375821, at *2 (W.D. Wis. Dec. 13, 2017) ("[A]ny employee's participation in this lawsuit will be obvious to the defendant, regardless

whether employees are joined as plaintiffs or simply included in a class, particularly because of the small size of the proposed class.").

More to the point, the evidence plaintiff points to in support of this fear are derived from Fabbrocini's own letters and those of others submitted to Nagy as part of his investigation. Critically, these letters concerned a period of time when Dr. Pearce remained as Chief, the same period encompassing the proposed class-based hostile work environment claim in this case. Since Dr. Pearce is no longer Chief, therefore, plaintiff has *no* evidence to support plaintiff's contention that a credible, ongoing concern about retaliation remains.[3]

Finally, plaintiff argued in her opening brief that joinder would be impractical because the claims of other female UW anesthesiologists would be time-barred or materially shortened if forced to join this lawsuit, as opposed to proceeding as members of a class action. In response, however, defendants point out that plaintiff's concern about the statute of limitations is contrary to the law. Specifically, in *American People & Construction Company v. Utah*, 414 U.S. 538 (1974), the Supreme Court explained that the "commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Id.* at 554; *see also Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 353-54 (1983) ("Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied. At that point, class

---

[3] Regardless, the joinder question necessarily concerns whether it is practical for putative class members to join *this* lawsuit, and plaintiff's argument that it would be impracticable to force relitigation of common issues amounts to a red herring.

members may choose to file their own suits or to intervene as plaintiffs in the pending action."). Indeed, plaintiff presumably recognized the lack of merit of this argument in failing to respond to it in her reply brief.

In addition to plaintiff failing to meet her burden of demonstrating that joinder is impracticable, the court cannot help but be struck by the lack of apparent interest in this lawsuit by other female UW anesthesiologists. While not explicit, a similar lack of interest appears to have played some role in the district court's finding of a lack of numerosity in *Anderson,* as well as the Seventh Circuit's affirmance of that decision. Specifically, the *Anderson* case involved hybrid state law and FLSA claims, but was originally certified only as an FLSA collective action. Only three individuals, however, opted into the FLSA collective action, leading plaintiff to move to decertify the collective action, settle the individual claims, and pursue a class action of the state law claim. 986 F.3d at 775-76. Similarly, in *Pruitt*, involving a claim of race discrimination, the court concluded that the lack of evidence of putative class members "desiring to participate" supported a finding that joinder would be practical. 472 F.3d at 926.

Here, the court only has Fabbrocini's account of her experiences of a hostile work environment, as supported by Nagy's report. While Nagy's report describes "many" women who experienced gender-related issues, no quantification is even suggested, and there is no basis for finding that the "majority" of women, as plaintiff represents in her briefing, would consent to the lawsuit. Indeed, relying solely on Nagy's report, gender-based bullying appears to be part of the story, but not the only part. Given the elements of a hostile work environment, therefore, the court simply has no basis to find that class

11

members seeking to pursue a hostile work environment claim like Fabbrocini would be anywhere near the 40 women or so identified, much more a number making joinder impracticable given the detailed, available records identifying possible class members.[4]

ORDER

IT IS ORDERED that plaintiff Maria Mina Fabbrocini, M.D.'s motion for class certification (dkt. #22) is DENIED.

Entered this 16th day of December, 2021.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

---

[4] In conducting this analysis, the court is conscious, as the Seventh Circuit explained in *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012), that the court should not engage in a merits assessment. Critically, therefore, the court is *not* finding that the class definition is overbroad by including all women -- particularly given the possibility, if not probability, that all women could have been subject to a hostile work environment claim -- but the lack of evidence of widespread interest in this class obviously factors into this court's finding that joining women interested in pursuing a hostile work environment would not be impracticable, in light of the other considerations discussed above.